(No. 68869.—

EVELYN L. WILLIAMS *et al.*, Appellees, v. THE IL-
LINOIS STATE SCHOLARSHIP COMMISSION *et
al.*, Appellants.

*Opinion filed October 18, 1990.—Rehearing denied
November 30, 1990.*

27

MILLER, J., joined by MORAN, C.J., and RYAN, J., dissenting.

28

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Rosalyn B. Kaplan, Assistant Attorney General, of Chicago, of counsel), for appellants.

John Ammann and Alan T. Stentz, of Alton, and Richard Chase, of East St. Louis, for appellees.

JUSTICE STAMOS delivered the opinion of the court:

Plaintiffs, Evelyn L. Williams and Iola Lockett, initiated a class action in the circuit court of Madison County to enjoin defendants, the Illinois State Scholarship Commission (ISSC), its executive director, and its commissioners, from filing collection actions in an improper venue. The plaintiffs' class, as certified by the trial court, consisted of individuals who have allegedly defaulted on Illinois Guaranteed Student Loans (GSLs) and did not reside in or obtain their loans in Cook County. Plaintiffs claimed that ISSC's practice of suing alleged defaulters exclusively in Cook County violates public policy. The class members further alleged that defendants' practice of requiring borrowers to execute a contract containing a venue waiver clause as a condition for obtaining a GSL also violates public policy, and that these practices violate due process and equal protection under both Federal and State constitutional law. Finally, plaintiffs alleged that a statute which defined Cook County as the exclusive venue for all lawsuits involving delinquent and defaulted student loans (Ill. Rev. Stat., 1988 Supp., ch. 122, par. 30—15.12) violates their due process and equal protection rights under the Federal and State Constitutions.

The circuit court found ISSC's practices of filing all collection actions in Cook County and requiring borrowers to execute lending contracts containing venue

waiver clauses violated public policy and were unconstitutional. The court also declared section 30—15.12 of the School Code (Ill. Rev. Stat. 1987, ch. 122, par. 30—15.12) unconstitutional and entered summary judgment in favor of plaintiffs. Specifically, the trial court issued an injunction which required defendants to sue any alleged defaulter in the defaulter's county of residence or in the county where the loan was obtained, and to refrain from taking any action, including post-judgment proceedings, in all pending cases brought in Cook County involving parties in plaintiffs' class at the time of suit. The injunction further prohibited defendants from executing contracts containing venue waiver clauses as a condition for obtaining a GSL. Finally, the trial court awarded plaintiffs attorney fees and interest. Because the circuit court declared the statute to be unconstitutional, appeal lay directly to this court (107 Ill. 2d R. 302(a)).

## FACTS

Defendant ISSC is a State agency created by the Higher Education Student Assistance Law (Ill. Rev. Stat. 1987, ch. 122, par. 30—15 *et seq.*) for the purpose of providing financial assistance to students in undergraduate, graduate, and vocational education programs. ISSC operates its student loan program in conjunction with the loans authorized and guaranteed under the Federal Higher Education Act of 1965, and serves as guarantor for the funds provided by the Federal loan program. (Ill. Rev. Stat. 1987, ch. 122, pars. 30—15.10, 30—15.10a; see 20 U.S.C. §1001 *et seq.* (1988).) ISSC is also empowered to make guaranteed loans of its own pursuant to the Federal guidelines. Ill. Rev. Stat. 1987, ch. 122, par. 30—15.11a.

The deposition of Joshua Hershman, ISSC's director of legal services, described the agency's procedures. In

order to obtain a GSL, a student must first file an application with the Federal Department of Education, and the application is then sent to one of three regional centers (located in Iowa City, Iowa; Jacksonville, Florida; and Princeton, New Jersey) for processing. The Federal regional office then determines whether the applicant qualifies for grant money (*i.e.*, money that does not require repayment) or whether the applicant qualifies for a GSL. If the applicant qualifies, the amount of the loan is calculated based upon the applicant's financial need in relation to Federal guidelines. The regional office then prepares a student aid report and electronically transmits the information contained therein to ISSC's computer system.

ISSC has three offices in Illinois—in Cook, Lake, and Sangamon Counties. After ISSC's computer system receives the electronically transmitted student aid report, ISSC prepares a loan guarantee, a loan agreement, and a promissory note for the applicant. Deposition testimony revealed that these documents could be prepared at any of ISSC's offices, because all that was necessary to prepare these documents was access to an ISSC computer terminal. However, it is unclear exactly where any of these documents are actually prepared. Mr. Hershman stated that the loan guarantees and the promissory notes were not necessarily prepared in the same office, and noted that the guarantee could even be prepared in one of the Federal regional offices. He further admitted that, under a new system recently adopted by ISSC, very few of these documents are actually prepared in Cook County. When asked in which office loan guarantees are actually approved, both Mr. Hershman and Nancy Pietryla, ISSC's manager of litigation services, did not know where the guarantee preparation took place, and Mr. Hershman "guessed"

that loan approval could be proper in any of the three ISSC offices.

After the loan is approved, ISSC forwards the paperwork to the student and the local lending institution, where the loan agreement is executed.

At the time this lawsuit was filed, ISSC's practice was to exclusively file in Cook County all suits against individuals who had allegedly defaulted on GSLs. This was done even in instances where the alleged defaulters resided in and obtained their loans in a locale quite distant from Cook County. Named plaintiff Iola Lockett, for example, obtained her loan in Madison County and resided there at the time she obtained the loan and at the time she was sued. Madison County is approximately 270 miles from Cook County.

ISSC also has a policy of pursuing post-judgment execution proceedings in Cook County against plaintiffs. For example, ISSC obtained a judgment against class member Carol Lynch in Cook County, even though she obtained her loan in Edgar County (approximately 180 miles from Cook County), where she resided at the time of the loan and currently resides. ISSC filed a post-judgment wage garnishment proceeding in Cook County against Ms. Lynch. Another example is class member Sherri Massey, who obtained her loan in Adams County (approximately 290 miles from Cook County), where she resided at that time and currently resides. After obtaining a judgment against her in Cook County, ISSC procured issuance of a citation to discover assets, also in Cook County. ISSC refuses to dismiss these post-judgment proceedings, even though Ms. Massey filed an affidavit to prove her income is exempt under her GSL agreement.

In 1982, ISSC began to require borrowers to execute loan agreements which contained venue waiver

clauses. An example of such a clause is found in the promissory note signed by named plaintiff Williams:

"As a condition of receiving this loan, I agree that any subsequent legal proceedings, necessary to enforce the obligations to the ISSC, may be instituted in the County of Cook, State of Illinois, and that I will not object thereto, notwithstanding that at the time the proceedings are instituted I may reside in a county other than Cook."

After the commencement of this litigation, the General Assembly enacted an amendment to section 30—15.12 of the School Code, which reads:

"The Commission *shall* file any and all lawsuits on delinquent and defaulted student loans in the County of Cook where venue *shall be deemed to be proper*." (Emphasis added.) (Pub. Act 85—827, eff. Jan. 1, 1988 (amending Ill. Rev. Stat. 1985, ch. 122, par. 30—15.12, now codified at Ill. Rev. Stat. 1989, ch. 122, par. 30—15.12).)

Plaintiffs amended their complaint to contend that this new statute violated due process and equal protection under both the State and Federal Constitutions.

## THE TRIAL COURT'S DISPOSITION OF THE CASE

In its order granting summary judgment in plaintiffs' favor, the trial court applied the balancing test set forth in *Mathews v. Eldridge* (1976), 424 U.S. 319, 334-35, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903, for determining whether a statute or governmental policy violates due process. This test calls for courts to weigh the costs of requiring a particular set of procedures against the benefits derived from the use of those procedures. In particular, the *Mathews* test consists of three factors: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or

substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

The trial court, in examining the first *Mathews* factor, identified the private interest at stake in this cause as the fundamental right of access to the courts, and found that filing collection actions and post-judgment proceedings in a distant and inconvenient forum deprived plaintiffs of any meaningful opportunity to defend themselves in these actions. (See *Mathews*, 424 U.S. at 333, 47 L. Ed. 2d at 32, 96 S. Ct. at 902 (fundamental requirement of due process is opportunity to be heard).) Examining the second factor, the court ruled that the risk of erroneous deprivation and the probable value of additional or substitute safeguards were great. Particularly, the court stated that the "mathematical nature" of the subject matter of these lawsuits would inevitably lead to ISSC's bringing collection actions in excess of the amounts plaintiffs owed on their GSLs. According to the trial court, requiring that all collection and post-judgment actions be brought in the county where the student resides or where the loan was obtained will help ensure that miscalculations are corrected and prevent erroneous deprivation of property. Further, this would enable class members to exercise statutory exemptions from garnishment and relieve them of the potential risk of incarceration for failing to appear at post-judgment citation hearings in a distant, inconvenient forum. Finally, the court determined that the State's interest in having all collection and post-judgment suits brought in a single forum for the sake of minimizing fiscal and administrative burdens on ISSC was not great, because the Illinois Attorney General, required by law to represent ISSC in liti-

gation, already brings actions on the part of other State agencies in every county in Illinois.

The trial court then balanced the three *Mathews* factors and determined that section 30—15.12 of the School Code and ISSC's practice of filing all its actions against allegedly defaulting debtors in Cook County violated due process. The court held that defendants had denied plaintiffs their fundamental right of access to the courts by filing collection actions in a distant and inconvenient forum and by not presenting a compelling interest in doing so. In addition, the court held that, even if there was no fundamental right at stake, ISSC had no rational basis for filing all its collection actions in Cook County.

The court also noted that, besides being violative of due process and equal protection, ISSC's policy of filing all its collection actions in Cook County when the borrower resides and obtained the loan in another county violates the State general venue statute, and is therefore contrary to public policy. (See Ill. Rev. Stat. 1987, ch. 110, par. 2—101.) The court also applied this reasoning to its consideration of defendants' procedure of using loan agreements containing venue waiver clauses and, citing *Martin-Trigona v. Roderick* (1975), 29 Ill. App. 3d 553, held that this practice was also contrary to public policy. The court concluded by enjoining defendants from continuing these practices, and awarding plaintiffs attorney fees and interest.

## ARGUMENT

Defendants perceive several flaws in the trial court's holding in this cause. They claim that it is erroneous to assume that the county in which a student applied for a loan or lived while attending school is more convenient than Cook County. Defendants assert that the trial court exaggerated any burdens on alleged de-

faulters who reside outside of Cook County by assuming all of them would be inconvenienced by a trial there. Also, defendants point to named plaintiff Williams, who they claim currently resides in Kalamazoo, Michigan, as a typical example of a student who no longer resides near where she went to school or obtained the loan (however, Ms. Williams' affidavit indicates she resided in Madison County at the time she obtained her GSL, and now currently resides in that county). Defendants claim that a borrower like Ms. Williams will not appear and defend in the county where the borrower obtained the loan or lived at that time, because such a county could be just as distant and inconvenient as Cook County.

The crux of defendants' argument on appeal, however, is that the record reveals that indifference on the part of plaintiffs or a lack of any defense to their GSL defaults, not the inconvenient venue, is the real reason why plaintiffs do not appear in Cook County. Defendants refute the trial court's *Mathews* analysis by stating that plaintiffs have no fundamental right to a particular venue, noting that the setting of venue is "a matter within the province of the legislature." (*Chappelle v. Sorenson* (1957), 11 Ill. 2d 472, 476.) They also claim it is error to assume that a defaulter must personally appear in court to settle the claim against her, explaining that ISSC is patient with student defaulters and is willing to work out alternative payment plans. Further, defendants opine that if borrowers truly had genuine defenses, they would make the effort to appear, even in an inconvenient forum. As to the risk of erroneous deprivation, defendants argue that there is none, because the record reveals that none of these plaintiffs denied their indebtedness nor presented a legitimate defense, and that any "mathematical errors" are not borne out by the record. Defendants admit the

State interest is efficiency, but add that, under the Federal GSL program, the State taxpayers bear the brunt of any unrecovered loan defaults. They also view the argument that the Attorney General already represents other State agencies in collection actions in every county as unpersuasive because those cases are substantially different. Also, defendants argue that the potential for an overwhelming number of GSL default cases in the near future is great. Defendants argue this sudden increase in case load would grossly inconvenience the non-Cook County offices of the Attorney General, which are unfamiliar with these types of cases and ill equipped to handle a radically increased case load. Further, defendants claim that the spreading of this potentially unwieldy case load to every county in the State would hinder the Attorney General's efforts to efficiently collect on defaulted GSLs.

Defendants cite to a factually similar case from a Federal appellate court (*Phillips v. Pennsylvania Higher Education Assistance Agency* (3d Cir. 1981), 657 F.2d 554) in support of their arguments. The *Phillips* case dealt with Pennsylvania's counterpart to ISSC and its practice of routinely filing all collection cases in Dauphin County. (*Phillips*, 657 F.2d at 558.) The *Phillips* court also used the three-factor *Mathews* test, but concluded that the Pennsylvania agency's practice of filing all its collection actions in a single forum did not violate due process. *Phillips*, 657 F.2d at 563-66.

The *Phillips* court first determined that the private interest was insubstantial because none of the plaintiff's class had attempted to transfer the case to a more convenient forum and that a personal appearance was unnecessary in order for a defendant to file an appearance. (*Phillips*, 657 F.2d at 561, 564.) Defendants in the case at bar argue that the same facts exist in

their appeal, and that, without a request for a transfer of venue, the opportunity is waived. (See 107 Ill. 2d R. 187(a); *Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 146-47, 149-50.) Also, the *Phillips* court distinguished a situation where a defendant is denied all access to the courts from the factual circumstances which existed in that case, where members of the plaintiff class had several alternative procedures to defend the cases against them which did not require personal appearances. *Phillips*, 657 F.2d at 564.

On the second *Mathews* factor, the *Phillips* court found no risk of an erroneous deprivation. The court determined that the right of access to the courts in that case was nonexistent and that there was no evidence that the *Phillips* class members faced a risk of erroneous monetary deprivation. (*Phillips*, 657 F.2d at 565.) In balancing the first two *Mathews* factors against the third, it concluded that the State's interest in avoiding the potential financial and administrative burdens it would incur if required to litigate in every county in the State, when compared with the insubstantiality or lack of any private interest, made the Pennsylvania agency's practice of filing all collection actions in a single forum constitutional. (*Phillips*, 657 F.2d at 565-66.) Defendants maintain that they are in an identical situation, and would have us adopt the same conclusions as the *Phillips* court in upholding both section 30—15.12 and the ISSC policy of filing all its collection suits in Cook County, which predates the statute.

Even if the statute were unable to withstand constitutional scrutiny, defendants argue that their policy of bringing all collection suits in Cook County comports with the general venue principles of Illinois law because a critical portion of the loan transaction took place in Cook County; that is, ISSC officially approved

the loans and prepared the documentation in the Cook County office. Asserting that, without ISSC's approval and the guarantee to the local lender, it is highly unlikely that these applicants would have obtained the loans, defendants claim that the work allegedly done on plaintiffs' loan agreements in the Cook County office constitutes enough of a "part" of the "transaction *** out of which the cause of action arose" to make venue in Cook County proper under the general venue statute. See Ill. Rev. Stat. 1987, ch. 110, par. 2—101.

As to the issue of the venue waiver clauses, defendants, while admitting that plaintiffs were not sophisticated business persons engaged in arm's length negotiations, claim that the record is devoid of any evidence that any plaintiff was unaware of, protested the inclusion of, or was unable to secure a GSL without the inclusion of such a provision. Particularly, defendants point to named plaintiff Lockett's loan agreement, which did not contain a venue waiver. Defendants maintain that this proves that a venue waiver provision is not essential to a GSL transaction and that omission of the venue waiver does not preclude ISSC from guaranteeing a loan.

Defendants also concede that one panel of the Illinois Appellate Court held that a waiver-of-venue provision is void as contrary to the general venue statute and public policy. (*Martin-Trigona v. Roderick* (1975), 29 Ill. App. 3d 553, 555.) Besides arguing that the *Martin-Trigona* case is distinguishable from the case at bar because the contractual clause in question in ISSC loan agreements is actually a forum selection clause and not a venue waiver clause, defendants cite a more recent appellate court opinion (*Calanca v. D & S Manufacturing Co.* (1987), 157 Ill. App. 3d 85), which held that forum selection clauses are valid unless their enforcement would be unreasonable under the circum-

stances. Specifically, the *Calanca* court required that a party opposing a forum selection clause show "that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." (*Calanca*, 157 Ill. App. 3d at 87-88.) Defendants would have us adopt *Calanca*'s holding as the proper view of the contractual provision in question in the case at bar, and assert that enforcing the provision does not deprive plaintiffs of their day in court.

Finally, defendants object to plaintiff's award of attorney fees. Obviously, defendants submit that, because plaintiffs were not entitled to summary judgment, the award of attorney fees must be vacated. However, assuming that plaintiffs are entitled to attorney fees, defendants submit that the trial court erred in awarding interest on those fees, based on our recent opinion in *In re Special Education of Walker* (1989), 131 Ill. 2d 300, 303-07.

## ANALYSIS

Both plaintiffs and defendants raised a myriad of issues at trial and before this court. We have determined, however, that only the following issues have any bearing on the disposition of this case: (1) plaintiffs' due process claims; (2) defendants' contention that the preparatory work done on the GSL agreements and the loan approval documents is enough of a "part" of the "transaction out of which the cause of action arose" to make venue in Cook County proper under the general venue statute; (3) the propriety of the venue waiver clause used in the GSL agreements; and (4) whether the assessment of attorney fees and interest was proper.

## I. Venue Under Illinois Law

The general venue statute in Illinois states:

"Except as otherwise provided in this Act, every action must be commenced (1) in the county of residence of any defendant *** or (2) in the county in which the transaction or some part thereof occurred out of which the cause of action arose." (Ill. Rev. Stat. 1987, ch. 110, par. 2—101.)

The basic purpose behind this enactment was to provide a forum that was convenient either to the defendant, by commencing the action near his home, or to the witnesses, by making it possible to litigate the case where the transaction occurred. (*Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, 328; Ill. Ann. Stat., ch. 110, par. 2—101, Historical & Practice Notes, at 56-57 (Smith-Hurd 1983) (citing Sunderland, *Observations on the Illinois Civil Practice Act,* 28 Ill. L. Rev. 861, 863-64 (1934)).) However, statutory venue requirements are procedural only, and have no relation to the power of a court to decide the merits of a case. Venue rules only define the particular court where a case is to be heard. See *Stambaugh v. International Harvester Co.* (1984), 102 Ill. 2d 250, 257; *Mosele,* 67 Ill. 2d at 328, citing *United Biscuit Co. of America v. Voss Truck Lines, Inc.* (1950), 407 Ill. 488, 501.

In the event a plaintiff files suit in an improper forum, the Civil Practice Law provides for the means to transfer the cause to a proper venue or dismiss the action, provided the defendant makes a timely motion to transfer venue. (Ill. Rev. Stat. 1987, ch. 110, pars. 2—104, 2—106, 2—619(a)(1).) Also, under the common law doctrine of *forum non conveniens,* an Illinois circuit court has authority to transfer a cause to the circuit court of another county within the State. (*Torres v. Walsh* (1983), 98 Ill. 2d 338, 347-51.) This doctrine

assumes that at least two proper forums exist in which the defendant is amenable to jurisdiction, and invokes principles of convenience and fairness in choosing among two or more forums that have jurisdiction. (*Foster v. Chicago & North Western Transportation Co.* (1984), 102 Ill. 2d 378, 381-82.) The inquiry in a *forum non conveniens* question requires a court to look beyond the statutory criteria for venue and to determine the relative convenience of competing forums. *Foster*, 102 Ill. 2d at 384-85; see *Torres*, 98 Ill. 2d at 351 (factors a trial court should consider in making *forum non conveniens* decision include availability of alternate forum, access to sources of proof, accessibility of witnesses, relative advantages and obstacles to obtaining a fair trial, congestion of the court dockets, and convenience of parties; only when factors strongly favor defendant should court disallow plaintiff's choice of proper venue).

Because venue is merely a matter of procedure, courts generally cannot interfere with the legislature's province in determining where venue is proper (*Chappelle v. Sorenson* (1957), 11 Ill. 2d 472, 476), unless constitutional provisions are violated. (*Power Manufacturing Co. v. Saunders* (1926), 274 U.S. 489, 495, 71 L. Ed. 1165, 1168, 47 S. Ct. 678, 680; *People v. Zegras* (1946), 29 Cal. 2d 67, 68, 172 P.2d 883, 884; *Johnson v. Nelson* (Iowa 1979), 275 N.W.2d 427, 429; *Willman v. McMillen* (Mo. 1989), 779 S.W.2d 583, 585; *Allen v. Smith* (1911), 84 Ohio St. 283, 290, 95 N.E. 829, 830-31; *Deese v. Williams* (1960), 236 S.C. 292, 295, 113 S.E.2d 823, 825; *Knapp v. Knapp* (Tex. Civ. App. 1965), 386 S.W.2d 630, 633.) Most courts, therefore, simply defer to the legislature when dealing with the validity of a particular venue statute (see *State v. Superior Court* (1978), 120 Ariz. 273, 585 P.2d 882; *Ramirez v. State* (Tex. Civ. App. 1977), 550 S.W.2d

121), and are generally loath to declare such statutes void. This court, in fact, has never declared a venue statute unconstitutional. But we have stated that a law fixing venue could be so arbitrary or unreasonable as to deprive defendants of due process. (*Mapes v. Hulcher* (1936), 363 Ill. 227, 231.) Therefore, after considering the three *Mathews* factors in light of both the purpose behind the general venue rules in Illinois and general principles of statutory interpretation, we determine that the special venue provision of section 30—15.12 is such an arbitrary and unreasonable statute.

## II. Due Process

### A. The Private Interest

While we admit that the trial court's application of the *Mathews* test in the case at bar sometimes lacked compelling legal reasoning, we cannot accept defendants' arguments for reversing the ruling. Contrary to defendants' claim that the trial court's use of the *Mathews* analysis was inappropriate because there was no fundamental right involved in the case at bar, ISSC's use of section 30—15.12 and its practice of filing post-judgment proceedings have the effect of depriving plaintiffs of their right of meaningful access to the courts.

Plaintiffs cite to *Boddie v. Connecticut* (1971), 401 U.S. 371, 377, 28 L. Ed. 2d 113, 118, 91 S. Ct. 780, 785, which states that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." (See *Mathews*, 424 U.S. at 333, 47 L. Ed. 2d at 32, 96 S. Ct. at 902.) Plaintiffs argue that because the members of their class are indigent, they cannot afford the

travel costs to the distant forum in Cook County. Thus, plaintiffs assert that defendants' practice of pursuing default judgments and post-judgment proceedings against such class members effectively deprived them of any "meaningful opportunity" to defend themselves.

Defendants counter this by pointing out that *Boddie* was a divorce case, and that the United States Supreme Court narrowly construed the right of access to the courts on this basis. The *Boddie* Court noted that in most instances, legal disputes can be settled by means other than the courts. A divorce, however, can only be obtained through the State court system. (See *Boddie*, 401 U.S. at 375-83, 28 L. Ed. 2d at 117-22, 91 S. Ct. at 784-89.) Defendants argue that *Boddie* would afford plaintiffs the right of access to the courts only if the courts were the sole means of remedying their GSL defaults. Defendants claim that a borrower's personal presence in court is not the exclusive method of responding to a collection suit, and therefore cannot rise to the level of a fundamental right. (See *United States v. Kras* (1973), 409 U.S. 434, 445, 34 L. Ed. 2d 626, 636, 93 S. Ct. 631, 638 (holding that indigent parties have no fundamental right to access in a bankruptcy proceeding because there are other means to negotiate and settle their debts besides filing for bankruptcy).) Further, they claim that ISSC's asserted willingness to be patient with defaulters and to offer alternative payment plans to GSL defaulters demonstrates that plaintiffs have nonlitigious means available to settle these default cases and clearly confirms that the right of access to the courts is not implicated in the case at bar.

We realize that *Kras* narrowly construed the right of access to the courts announced in *Boddie*. However, we disagree with defendants' contention that this narrow construction distinguishes *Boddie* from the case at

bar and refutes the trial court's analysis of the first *Mathews* factor in this case. We first note that the right of access to the courts is not necessarily as narrowly construed as defendants indicate. Federal courts have recently given more recognition to this right. (See *Harrison v. Springdale Water & Sewer Comm'n* (8th Cir. 1986), 780 F.2d 1422; *McCoy v. Goldin* (S.D.N.Y. 1984), 598 F. Supp. 310.) These cases are distinguishable from the case at bar in that they define the right of access to the courts as an aspect of the first amendment right of petition and frame the right in terms of a plaintiff's right (plaintiffs in case at bar are a class of *defendants*). However, the source of the right of access to the courts in these cases could be broadly interpreted to include a defendant's due process rights (*McCoy*, 598 F. Supp. at 315 (right of access to courts is also found in due process clauses of the fifth and fourteenth amendments); see also *Chambers v. Baltimore & Ohio R.R. Co.* (1907), 207 U.S. 142, 148, 52 L. Ed. 143, 146, 28 S. Ct. 34, 35 (the right to sue and *defend* in the courts is foundational in our governmental system)), and *McCoy* and *Harrison* appear to indicate that Federal courts are willing to begin to expand the right of access to the courts in situations that warrant it. We also note that other State supreme courts have recognized the right of access to the courts. For example, the Alaska Supreme Court stated that the right of access to the courts is an important right. Specifically, that court said that the legal rights which a litigant might seek to exercise or protect exist only to the extent they are enforceable through the court system. Depriving a litigant of the opportunity to use the courts effectively makes these legal rights worthless. See *Patrick v. Lynden Transport, Inc.* (Alaska 1988), 765 P.2d 1375, 1379; *Bush v. Reid* (Alaska 1973), 516 P.2d 1215, 1219; see also *Ryland v. Shapiro* (5th Cir.

1983), 708 F.2d 967, 972 (right of access to courts guaranteed and protected from unlawful interference and deprivation by the State).

Also, the record belies defendants' claim that plaintiffs had other avenues, besides going to court, by which to settle their claims. The record shows that in several instances, members of plaintiffs' class had defenses to present in their GSL collection suits. These class members attempted to contact ISSC, but either received unsatisfactory responses or were told that nothing could be done to help them. In each of these instances, ISSC proceeded with the suit anyway, received default judgments against the debtors, and initiated post-judgment proceedings. For each of these class members, then, the judicial proceeding became the only effective means of resolving the dispute. The only way they could have protected their rights or presented their claims for a defense was to travel to Chicago and appear in the case. The statute and ISSC practice, therefore, combined to effectively deny these class members full access to the legal process, which "raises grave problems for its legitimacy." (*Boddie*, 401 U.S. at 376, 28 L. Ed. 2d at 118, 91 S. Ct. at 785.) Viewed in this light, the case at bar fits within the *Kras* Court's narrow construction of the right of access to the courts recognized in *Boddie*.

Thus, it is not just the arbitrariness of establishing venue in Cook County that infringes plaintiffs' right of access to the courts. The evidence reveals that defendants also refused to offer class members any alternative means of dispute settlement outside the courtroom, while vigorously pursuing default judgments against them in a distant forum. (*Cf. Phillips*, 657 F.2d at 557-58 (outlining extensive procedures used by Pennsylvania counterpart to ISSC to assist defaulters in repaying loans before suits were filed). But see gen-

erally N.Y. Times, Feb. 7, 1990, at B7, col. 5 (nat'l ed.) (chart showing that most States which increased GSL collection from 1986 to 1988, including Pennsylvania, cite litigation as a primary means to accomplish this goal).) This evidence exposes the duplicitous nature of defendants' claim that plaintiffs actually have the ability to defend themselves out of court. Accordingly, we agree with the trial court's conclusions under the first *Mathews* factor.

## B. Risk of Erroneous Deprivation and Probable Value of Safeguards

Defendants are correct in criticizing the trial court's analysis of the second *Mathews* factor. The trial judge's concern that there is a great potential for "mathematical errors" in the default judgments entered against plaintiff class members is not borne out in the record. None of the class members who filed affidavits in the trial court complained of errors in the amount of the judgments entered against them. The record also does not reveal any propensity on ISSC's part for calculation errors.

However, we must disagree with defendants' claim that there was no risk of erroneous deprivation of a private interest. Despite defendants' contention that none of the plaintiffs had legitimate defenses, the record does show that several class members did indeed have defenses to present. Moreover, the fact that default judgments are regularly entered against plaintiffs who, for all practical purposes, cannot appear in Cook County is itself a possible erroneous deprivation. See *Peralta v. Heights Medical Center, Inc.* (1988), 485 U.S. 80, 85, 99 L. Ed. 2d 75, 81, 108 S. Ct. 896, 899.

In *Peralta*, a hospital brought an action against an employer who had guaranteed the debt of one of his employees to the hospital. The hospital did not effect

service on the employer, and, when the employer did not appear, a default judgment was entered against him. This judgment was then abstracted and recorded, creating a cloud on the employer's title to real property. A writ of attachment followed, and, unbeknownst to him, the employer's property was sold to satisfy the judgment for much less than its true value. (*Peralta*, 485 U.S. at 82, 99 L. Ed. 2d at 79, 108 S. Ct. at 897.) One of the arguments made to the *Peralta* Court for upholding the judgment was that the employer suffered no harm because he had no meritorious defense in the case. The hospital argued that, without a defense, the same result would be entered on a retrial. *Peralta*, 485 U.S. at 85, 99 L. Ed. 2d at 81, 108 S. Ct. at 899.

The *Peralta* Court refused to accept this argument, stating that had the employer received notice of the suit, he might have exercised one of several options to settle his obligation to the hospital. The Court further held that the entry of the judgment itself had serious consequences for the employer. Particularly, the judgment lien encumbered the property, impairing the employer's ability to sell or mortgage it. The Court specifically stated that the State procedures for enforcing the lien are also subject to the strictures of due process. *Peralta*, 485 U.S. at 85, 99 L. Ed. 2d at 81, 108 S. Ct. at 899.

While factually distinguishable from the case at bar, we find the *Peralta* case helpful in determining the possibility of erroneous deprivation in this case. We have already stated that filing ISSC's collection suits in a distant forum, combined with the lack of substantive evidence that ISSC offered plaintiffs any alternative means to settle the claims outside of the litigation process, effectively deprived plaintiffs of any meaningful opportunity to be heard in a court of law. We find a parallel between the employer in *Peralta*, who was un-

able to appear because the hospital failed to effect notice and deprived him of his opportunity to appear and defend himself (even though he did not have a meritorious defense), and plaintiffs, who were unable to appear because of the inconvenient forum and whose chances to present even nonmeritorious defenses were also nil. In both cases, the entering and enforcing of the default judgments were, at best, arbitrary processes which did not allow for any realistic opportunity for the alleged defaulters to appear in court and protect their interests in their property. The *Peralta* Court held that a decision that allowed a default judgment to stand, absent a showing of a meritorious defense to an action in which a judgment with tremendous adverse consequences was entered without notice to the defendant, was "plainly infirm" under the due process clause. (*Peralta*, 485 U.S. at 86, 99 L. Ed. 2d at 82, 108 S. Ct. at 900.) We find that allowing the similarly adverse default judgments in the case at bar to stand, where the judgments were entered in instances where the defaulters' ability to defend themselves was, for all practical purposes, nonexistent, runs the very real risk that the alleged defaulters' rights will be erroneously deprived. See *Lecates v. Justice of Peace Court No. 4* (3d Cir. 1980), 637 F.2d 898, 908 n.16 (individual who is denied access to the courts faces potential deprivation as great as the loss of liberty a criminal defendant faces if the denial causes him to be threatened with loss or attachment of wages, personal or real property, and the future ability to obtain employment or credit).

A more obvious risk of erroneous deprivation exists for the class members who allegedly could have presented meritorious defenses. Unlike the *Peralta* employer, these plaintiffs might have avoided an adverse judgment if they had had the ability to appear in the

collection action. These plaintiffs, however, also had default judgments entered against them. Once these judgments are entered, plaintiffs' property and income are subject to execution proceedings, such as garnishments, confiscation of tax refunds, and liens against property. (See Ill. Rev. Stat. 1987, ch. 110, par. 2—1402.) Under ISSC procedure, these post-judgment proceedings are also filed in Cook County. If the individual class member had a legitimate defense, she will have been deprived of property, income, or both, because she had no meaningful opportunity to present the defense, either in the collection suit or in the post-judgment proceedings.

Also, under the current procedures for a post-judgment citation to discover assets, the judgment debtor must make an appearance in court and produce records pertaining to the debtor's property and income. If the debtor fails to comply with the citation, she may be held in contempt. (See 107 Ill. 2d Rules 277(c)(3), (h).) Therefore, the debtor plaintiff's inability to appear in Cook County may result in her incarceration. In the cases where plaintiffs have legitimate defenses, this presents the strong possibility of erroneous deprivation of the fundamental right of liberty. U.S. Const., amend. XIV ("nor shall any State deprive any person of *** liberty *** without due process of law"); Ill. Const. 1970, art. I, §2.

We conclude that any plaintiff class members who have a defense (legitimate or otherwise) to ISSC's accusations that they have defaulted on their GSLs may be erroneously deprived of property or liberty under section 30—15.12 and the ISSC's practice of filing all default proceedings in Cook County.

The second half of the second *Mathews* factor requires a court to examine the probable value, if any, of additional or substitute procedural safeguards. In the

case at bar, the logical additional procedure would be to allow for an alternative venue under section 30—15.12 in the county of a debtor's residence or in the county where the loan was obtained. This additional safeguard would allow both the courts and debtor defendants to use the legal machinery now in existence (*i.e.*, statutory provisions allowing for transfer or dismissal due to improper venue and the *forum non conveniens* doctrine) to protect indigent defaulters who reside outside of Cook County from the arbitrary denial of their right of access to the courts.

Defendants, at oral argument, attempted to address this issue by alleging that any of these class members could have had their cases transferred to a more convenient forum through the use of the *forum non conveniens* doctrine. Further, defendants claimed that GSL defaulters have used *forum non conveniens* transfers both before and after the enactment of section 30—15.12 to remedy the problems connected with inconvenient venue. Therefore, defendants argue, because there is already a viable procedural safeguard in existence, any additional procedures are unnecessary. This would also make a *Mathews* analysis unnecessary, because the existing procedural safeguards provide plaintiffs with adequate due process protection.

We cannot agree. Defendants presented no evidence to the trial court or this court that a *forum non conveniens* procedure has ever been successfully used in an ISSC collection action. Also, the language of section 30—15.12, in light of its legislative history, reveals that the General Assembly did not provide for *any* procedural safeguards in the statute, and were unconcerned about avoiding the types of forum abuse that exist in the instant case.

Courts, when interpreting a statute, must give the language of that statute its plain and ordinary meaning

(*Maloney v. Bower* (1986), 113 Ill. 2d 473, 479), and should first look to the statutory language as the best indication of the intent of the drafters (*County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 151). The language of section 30—15.12 clearly precludes any alternative venue in ISSC collection actions. The statute states, "The Commission *shall* file *any and all lawsuits* on delinquent and defaulted student loans in the County of Cook where venue *shall be deemed to be proper.*" (Emphasis added.) (Pub. Act 85—827, eff. Jan. 1, 1988 (amending Ill. Rev. Stat. 1985, ch. 122, par. 30—15.12, now codified at Ill. Rev. Stat. 1989, ch. 122, par. 30—15.12).) This language, particularly the phrase "any and all lawsuits," indicates a clear intent that there be no exceptions to the venue of ISSC collection suits.

In construing a statute, this court has also stated that the fundamental principle of statutory construction is to give effect to the intent of the legislature. (*Faheem-El v. Klincar* (1988), 123 Ill. 2d 291, 297-98.) Where a statute is susceptible to two interpretations, it is proper to examine sources other than a statute's language for legislative intent. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 279.) Because defendants argue that section 30—15.12 can be interpreted to allow for transfers to other venues, we look to the legislative history of the bill which led to the special venue provision to help clarify legislative intent. After studying the legislative history, we see that the act's sponsors also intended that no alternative venue be available under section 30—15.12. (See 85th Ill. Gen. Assem., House Proceedings, June 29, 1987, at 174-79.) Defendants' claim that the procedural safeguard of an alternative forum can be found in the language and history of the venue provision of section 30—15.12 is unfounded.

The legislative intent, therefore, was apparently to exempt ISSC collection actions from the general venue statute (Ill. Rev. Stat. 1987, ch. 110, par. 2—101) and from the statutory protection allowing for transfer or dismissal when venue is improper (Ill. Rev. Stat. 1987, ch. 110, pars. 2—104, 2—106), as well as to prevent alleged GSL defaulters from using *forum non conveniens* to transfer their cases. We have already explained that venue is a legislative prerogative with which the courts will generally not interfere. However, by not allowing for a means to challenge venue in section 30—15.12, the General Assembly has created an apparent conflict between the Civil Practice Law and the special venue provision contained in the School Code.

We presume that statutes which relate to one subject are governed by one spirit and a single policy, and that the legislature intended the enactments to be consistent and harmonious. Even when apparent conflicts exist, we are to construe such statutes in harmony with each other, if reasonably possible. (*People v. Maya* (1985), 105 Ill. 2d 281, 286-87.) In attempting to reconcile the plain meaning of and legislative intent behind the general venue statute · and section 30—15.12, we find it is not reasonably possible to harmonize these statutes.

The clear intent of the legislature in enacting the general venue statute was to insulate defendants from being sued in faraway places where they neither reside nor carry on any activities, and to make it more convenient to litigate the action by conducting the trial in the same venue where the transaction took place. (*Mosele*, 67 Ill. 2d at 328; *Blakey v. Commonwealth Edison Co.* (1977), 52 Ill. App. 3d 454, 457, citing *American Oil Co. v. Mason* (1971), 133 Ill. App. 2d 259, 261.) Illinois courts have repeatedly upheld these purposes, stating that a defendant has the right to insist upon a

proper venue, provided he does so in a timely manner. (*Blakey*, 52 Ill. App. 3d at 456; *Winn v. Vogel* (1952), 345 Ill. App. 425, 430; see *Heldt v. Watts* (1946), 329 Ill. App. 408, 414 (legislature, in enacting general venue statute, clearly meant to protect defendants against a plaintiff arbitrarily selecting a forum).) Therefore, section 30—15.12's language and legislative history are in direct conflict with the plain language and legislative intent of the existing venue statutes and refute generations of legal precedent which characterized a convenient venue as a right. These two statutes cannot possibly be interpreted as consistent and harmonious in language or intent.

Defendants cite to *Bank of Hickory Hills v. Hammann* (1982), 108 Ill. App. 3d 834, 837-38, to argue a method for harmonizing these two statutes and for interpreting section 30—15.12 as allowing for transferring ISSC collection actions to a forum outside of Cook County. *Hammann* dealt with the venue rules of supplementary proceedings and involved a post-judgment proceeding against a third party (a bank) which had not appeared at the original trial. (*Hammann*, 108 Ill. App. 3d at 835.) Supreme Court Rule 277 requires that a supplementary proceeding against such a third party must be commenced in the county where the party resides. (107 Ill. 2d R. 277; *Hammann*, 108 Ill. App. 3d at 837.) The *Hammann* plaintiff, however, had not brought the post-judgment proceeding in the county where the third party resided; therefore, that party moved for a dismissal because of improper venue. The trial court granted this motion. *Hammann*, 108 Ill. App. 3d at 835-36.

The appellate court reversed, noting that the language of the former Civil Practice Act provided, "The provisions of this Act apply to all civil proceedings except *** proceedings in which the procedure is regu-

lated by separate statutes. In all those proceedings the separate statutes control to the extent to which they regulate procedure, but this Act applies as to matters of procedure not so regulated by separate statutes." (*Hammann*, 108 Ill. App. 3d at 837, quoting Ill. Rev. Stat. 1981, ch. 110, par. 1, amended by Pub. Act 82—280, eff. July 1, 1982 (incorporating this language into new section 1—108(b) of the Code of Civil Procedure).) The *Hammann* court held that Rule 277, as a separate "statute," took precedence over the general venue statute in that it specifically established venue in the county of a third party's residence, which is a matter of procedure. However, because Rule 277 contained no provisions for challenging venue or transferring to a more convenient forum, the specific sections of the Civil Practice Act that controlled these procedures were still available to the *Hammann* defendant to correct any violations of the venue requirements of Rule 277. Therefore, because the *Hammann* defendant failed to make a timely motion for transfer of venue, the court held that the issue of any impropriety of venue was waived on review.

Defendants would have us make a similar determination in the case at bar. They argue that, under section 1—108(b) (Ill. Rev. Stat. 1987, ch. 110, par. 1—108(b)), the Code of Civil Procedure allows section 30—15.12, as a separate statute, to take precedence over the general venue statute to the extent that section 30—15.12 establishes Cook County as the proper venue for ISSC collection actions. They would also have us adopt the *Hammann* court's analysis and hold that, because the special venue provision of section 30—15.12 contains no references to challenging venue or transferring to a more convenient forum, the statutes and rules governing these procedures are still applicable to alleged GSL defaulters who find themselves

in an inconvenient forum when sued by ISSC. Therefore, because plaintiffs in the case at bar allegedly did not make any motions to transfer to a more convenient forum, their claim that the venue in the case at bar was improper was also waived.

This argument is not compelling. The *Hammann* case is distinguishable from the case at bar on several grounds. The opening sentence of Rule 277(d) states that supplementary proceedings may be brought in the court in which the judgment was entered. (107 Ill. 2d R. 277(d).) This is logical and comports with the purposes which underlie the general venue statute, because if venue is proper in the original trial, and the defendant submits to that venue, bringing the post-judgment proceeding in the same forum allows for more efficient enforcement of judgments. In most cases, a defendant will not object to venue in the supplemental proceeding because that defendant has already submitted to that forum by appearing in the original trial. Rule 277's different provision for third parties is just as logical, and also comports with principles of general venue. The trial court that entered the original judgment may have jurisdiction over a third party who was not joined in the original lawsuit. However, the third party may reside in a distant, inconvenient forum. Therefore, Rule 277(d) was designed for the convenience of such defendants.

In contrast, the only purpose behind the special venue provision of section 30–15.12 is the convenience of ISSC's legal department and the Attorney General. As we have already discussed, this is inapposite to the purposes of the general venue statute. Thus, the statute in question in the case at bar is *not* a logical extension of the legislature's previous pronouncements regarding venue. Also, as we will discuss in the next section, the government actually has no logical reason,

besides ISSC's convenience, to change its venue rules. The mandatory venue provision of section 30—15.12 also appears to apply to all defendants in all actions, while the mandatory language contained in Rule 277(d) applies only to third parties involved in supplementary proceedings. Further, while the *Hammann* case dealt with a defendant who objected to a plaintiff's failure to follow a special venue rule designed to protect that particular type of defendant, the case at bar involves parties who object to ISSC's having *followed* a special venue statute which, as revealed in its legislative history, was designed with very little thought given to the convenience of parties who reside in distant forums.

Yet even if we applied *Hammann*'s holding that special venue provisions which exist outside the Civil Practice Law can be interpreted in light of the Law's provisions for challenging venue, this would not solve the problem of indigent borrowers' having access to the courts. To make a motion for transfer or a *forum non conveniens* motion, the class members would still have to file a special appearance in the circuit court of Cook County. This also fails to address a second problem. In *Hammann*, the case was filed in the incorrect venue, and therefore, the *Hammann* defendant had an opportunity to use the statutory or common law vehicles for transferring the cause to the *proper* forum. (See *Hammann*, 108 Ill. App. 3d at 837.) ISSC, however, brought the collection actions in the case at bar in the statutorily correct forum. Section 30—15.12's language and legislative history establish that forum as the *only* proper venue for GSL collection suits. Lacking any alternative forum, the circuit court of Cook County is powerless to grant a *forum non conveniens* motion in GSL collection suits. See *Foster*, 102 Ill. 2d at 381-82.

Specifically, the record reveals that one of the named plaintiffs, Iola Lockett, through her attorney,

did file a special appearance and a motion to transfer venue in the circuit court of Cook County. There was no evidence that the trial court considered this motion. However, considering the factors a court should contemplate in determining whether to transfer a case to a more convenient forum (see *Torres*, 98 Ill. 2d at 347-51) and, had section 30—15.12 been in effect at the time Ms. Lockett's motion was filed, in light of *Hammann*'s holding regarding special venue provisions outside of the Civil Practice Act, Ms. Lockett's motion should have been granted. Therefore, it appears that, without an opportunity for a borrower to make a personal appearance, the Cook County circuit court is unwilling, or at least is not persuaded, to grant venue transfers in GSL collection cases. The failure of the trial court to address this motion might also mean that the court recognized that it had nowhere to transfer the case, as we have already noted. In either instance, the plain meaning of section 30—15.12 can only contribute to this derogation of Illinois' general venue principles and the violation of plaintiffs' right to defend their interests in a court of law. This also means, at least in Ms. Lockett's case, there was no waiver of the issue of the impropriety of the venue of the class members' collection cases. (See 107 Ill. 2d R. 187(a); *Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 146-47, 149-50.) Accordingly, the reasoning of *Hammann* does not apply to the case at bar and does not assist us in harmonizing our interpretation of the general venue statute and section 30—15.12.

When two statutes that relate to the same subject cannot be construed harmoniously, courts are guided by general rules of statutory construction to resolve the conflict. Generally, specific statutory provisions control over general provisions on the same subject (*Sierra Club v. Kenney* (1981), 88 Ill. 2d 110, 126; *Bray v. In-*

58

*dustrial Comm'n* (1987), 161 Ill. App. 3d 87, 92), and where two statutes conflict, the more recent takes precedence over the earlier (*Kuhl v. Industrial Comm'n* (1986), 147 Ill. App. 3d 519, 524). Therefore, if we were to follow those rules in this instance, we would uphold section 30—15.12's venue provision as the newer and more specific legislative enactment.

This conclusion is not satisfactory. It fails to explain the legislature's arbitrary and sudden shift away from its established principles of venue. It would also encourage other State agencies to evade the purposes of the general venue statute by convincing the legislature to insert, as was done in the case at bar, a single sentence in a statute totally unrelated to civil procedure. This would effectively force every party sued by a State agency to "be entirely at [an agency's] mercy, since such an action could be made oppressive and unbearably costly" (*Heldt*, 329 Ill. App. at 414), and place venue "in a faraway place where [the party] neither resides nor carries on any kind of activities" (*American Oil Co.*, 133 Ill. App. 2d at 261).

All of these factors combine to reveal that the additional procedural safeguard of an alternate forum not only would protect plaintiffs' right of access to the courts, but would avoid the otherwise irreconcilable conflict between the plain language and legislative intent of the Civil Practice Law and section 30—15.12. We conclude that there is great constitutional value in requiring an alternative forum in section 30—15.12's venue provision. We therefore agree with the trial court's conclusions regarding the second *Mathews* factor.

### C. The Government's Interest

Finally, we agree with the trial court's analysis of the third *Mathews* factor, the government's interest.

Defendants claim that the State's interest in having all ISSC collection suits tried in Cook County lies in the ability to monitor and process these lawsuits in a timely and efficient manner, with the lowest possible expenditure of State funds. They further note that, by expeditiously collecting on defaulted loans, ISSC will make up for the revenue lost to the Federal government from the State's guaranteeing these loans. They conclude that these interests outweigh those of the plaintiff class.

We disagree. Even in the precedent upon which defendants would have us rely, a Federal court of appeals determined that the perceived government interest "may not be strong." (*Phillips*, 657 F.2d at 565.) The *Phillips* court stated there was little evidence presented regarding the fiscal cost of bringing suit in every county in Pennsylvania as opposed to filing all the collection suits in a single county. However, the court did note that if Pennsylvania's counterpart to ISSC were forced to litigate on a statewide basis, it would have to familiarize itself with the rules of each county's court system and possibly engage separate counsel in each county, while each of those courts would have to familiarize itself with that State agency. The *Phillips* court concluded that these added burdens "would necessarily have a fiscal component," but could only characterize the government interest in that case as "not negligible." (*Phillips*, 657 F.2d at 565.) However, in its own application of the *Mathews* factors, the *Phillips* court found that no private interest existed and held that there was no possibility of any erroneous deprivation. (*Phillips*, 657 F.2d at 564-65.) Thus, even "not strong" but more than "negligible" government interests outbalanced the nonexistent interests of the borrowers. *Phillips*, 657 F.2d at 565-66.

The evidence presented to this court in the case at bar regarding the State's interest in bringing all GSL collection suits in Cook County is apparently more detailed than that which the *Phillips* court had to review. Illinois law requires that the Attorney General represent ISSC in its litigation matters. (See Ill. Rev. Stat. 1987, ch. 127, pars. 1301, 1302.) Defendants argue that ISSC's ability to consolidate all its litigation in Cook County allows its legal staff to standardize its procedures, keep overhead costs low, and process a large case load more efficiently because the centralized location allows for a smaller staff and a single assistant Attorney General to cover all the cases.

Defendants make claims similar to the *Phillips* court's conclusions: that ISSC will incur increased costs and administrative burdens if forced to file suit in all 102 counties in Illinois. Particularly, defendants argue that more than one assistant Attorney General would have to become involved in the ISSC case load, and each counsel would be forced to become acquainted with each county's local procedural rules. Spreading the collection suits across the State would also allegedly result in less efficiency in collecting on defaulted GSLs. The legislative history of section 30—15.12 also indicates that efficiency is the primary motive for having all ISSC collection actions brought in Cook County. 85th Ill. Gen. Assem., House Proceedings, June 29, 1987, at 174 (ISSC legal office is in Chicago; therefore, "it is simply more convenient for [ISSC] if the venue for those cases is Cook County").

We characterize the weight of the State's interest in the case at bar the same way the *Phillips* court did— "not strong." While it is arguably more efficient and less expensive for ISSC to file all of its lawsuits in a single venue, the added administrative burden of requiring ISSC to file suit in the county of the borrow-

er's residence or in the county where the loan was procured will indeed be negligible.

First, the populations of Illinois and Cook County are approximately 11.4 million and 5.25 million, respectively. (The World Almanac and Book of Facts 575-76 (1989); Illinois Blue Book 381 (1989-1990).) Logically, assuming that the same population ratios apply to student borrowers statewide and in Cook County, nearly half of all of ISSC's collection suits would lie inside Cook County under the general venue statute anyway. This defuses some of defendants' concern over the apparent total decentralization of ISSC's legal work in the wake of the invalidation of section 30—15.12's venue provision.

Second, there is nothing in the record to indicate that filing these collection suits in other counties of the State will take any more time or be any more difficult than filing suit in Cook County. Defendants claim that the number of collection suits which ISSC will file against defaulting debtors will quadruple (from 5,000 to 20,000) in the next three years. While they fail to offer any substantive evidence for this rate of increase or the actual fiscal burden such an increase would have on the Attorney General's office, they also fail to present any evidence or argument that indicates how filing these tens of thousands of lawsuits in Cook County will be more efficient than if filed under the provisions of the general venue statute. There is already a huge case backlog in the Cook County circuit court. Adding another 15,000 collection cases in the next three years can only add to that backlog. It would be eminently more efficient to file the cases involving defendants who live outside of Cook County in the county where the defendant resides or where the loan was obtained, where the population density and case backlog would allow for a quicker and less expensive

disposition of the case. See 85th Ill. Gen. Assem., House Proceedings, June 29, 1987, at 174-76 (Rep. Countryman of De Kalb County expressing concern over Cook County case backlog, particularly noting Cook County's shortage of judges and courtrooms).

Also, it would be more efficient and arguably less costly to try these cases where the witnesses and evidence are located. The student borrowers are obligated to pay the loans back to the local lending institutions; therefore, any evidence involving defaults, payment methods and records, or potential claims and defenses, and any testimony of witnesses intimately familiar with the borrower's case, would involve the employees and record keeping of the local lender. The deposition testimony of ISSC's legal representatives revealed that the loan approval process has been delegated to computer programs. The evidence of how and why a particular borrower was approved could easily be obtained from one of the computer terminals in any one of ISSC's three offices and presented at trial through the use of an affidavit or deposition of the ISSC employee who obtained the information from the computer. This would be far more efficient and less expensive than collecting and transporting all the records of the local lender, taking the depositions of all the local witnesses or, worse yet, paying to have local witnesses travel to Chicago to testify in person.

Further, the Attorney General, as ISSC's legal representative, has satellite offices throughout the State and routinely litigates in every county in Illinois. The Attorney General routinely represents many other State agencies in every county in Illinois. To require similar procedures on behalf of ISSC would not require the office of the Attorney General to do anything it does not already do. Each of the Attorney General's local offices is already intimately familiar with local rules

and procedures. Therefore, defendants' argument that requiring ISSC to file suits in counties other than Cook would grossly inconvenience the Attorney General has no basis in fact.

When we balance our findings under each of the *Mathews* factors, we conclude that both section 30—15.12 and defendants' practice of filing all ISSC collection actions exclusively in Cook County violate due process. We admit that, standing alone, requiring venue to be in a particular county does not necessarily infringe upon plaintiffs' right of access to the courts. However, the burden of an inconvenient forum, when combined with the indigence of the class members, the combined evidence of ISSC's lack of good faith in allegedly offering nonlitigious means of settling its claims against student borrowers and defendants' vigorous pursuit of default judgments against class members, and the statute's lack of provisions for an alternative forum, leads us to conclude that section 30—15.12 and defendants' practices effectively deprive plaintiffs of any means of defending themselves in these actions. This raises their personal interest to the level of a due process deprivation. (See *Boddie*, 401 U.S. at 377, 28 L. Ed. 2d at 118, 91 S. Ct. at 785.) A class member with a legitimate defense faces the very real risk of an erroneous deprivation, and the simple addition of provisions for an alternative forum would remedy any denial of the right of access and the risk of erroneous deprivation. These factors, considered against the weight of the weak governmental interest in exclusively limiting these collection suits to a Cook County forum, lead us to conclude that both the venue provision of section 30—15.12 and ISSC's practice of filing all its collection actions in Cook County violate due process of law.

We also observe that the *Phillips* case is readily distinguishable from the case at bar in ways other than

that decision's characterization of the governmental interest under *Mathews*. First, *Phillips* did not deal with a statutory requirement that venue be in a single forum, but only the practice of an agency filing all its collection suits in a single county. (*Phillips*, 657 F.2d at 558.) This allowed the *Phillips* court to consider that State's counterparts to our statutes and case law which provide for transfer to a more convenient venue. (*Phillips*, 657 F.2d at 564.) As we have already shown, section 30—15.12 does not allow for any venue transfers.

This first distinguishing factor relates to the second: that the *Phillips* court found no right of access to the courts. This holding was based on the ability of the *Phillips* class to transfer to a more convenient forum and certain specific Pennsylvania statutory procedures which allow access to the judicial process without making a personal appearance. (*Phillips*, 657 F.2d at 564.) Again, the statute in the instant case does not allow an alternative venue. Also, there was no evidence that plaintiffs in this case could have defended their interests without making a personal appearance. Further, the *Phillips* court noted that, while a monetary deprivation may invade a substantial interest, the class members in that case did not assert any interest involving financial loss due to a default judgment which did not afford them an opportunity to defend themselves. (*Phillips*, 657 F.2d at 564.) The case at bar, on the contrary, involved several plaintiffs against whom defendants had obtained default judgments and instituted post-judgment proceedings, while these same plaintiffs had no opportunity to defend themselves.

The *Phillips* court also found no possibility of erroneous deprivation and no need for additional safeguards. Because it found no private interest, the *Phillips* court naturally had little trouble finding that

the risk of loss of the "right" at stake was also nonexistent. Substitute procedures were deemed unnecessary due to the alternative statutory procedures available in Pennsylvania and the agency's great willingness to adjust payment schedules and temporarily defer payments. (*Phillips*, 657 F.2d at 564-65.) The case at bar involved plaintiffs with allegedly legitimate defenses which they were unable to present because of the lack of statutory alternatives and ISSC's refusal to work out alternative payment plans.

Cases from other jurisdictions where special venue statutes were upheld as the prerogative of the legislature are also distinguishable from plaintiffs' case, usually because the statutes and procedures involved offered some kind of more convenient alternative forum. (See *Dunn v. Carruth* (1989), 162 Ariz. 478, 480, 784 P.2d 684, 686 (interpreting venue statute, which allowed Attorney General to transfer all cases against the State to single county, to also allow for second transfer to a more convenient forum under *non conveniens* principles); *Johnson v. Nelson* (Iowa 1979), 275 N.W.2d 427, 429-31 (allowing transfer of legal malpractice action to county where alleged events occurred); *Deese v. Williams* (1960), 236 S.C. 292, 298, 113 S.E.2d 823, 826 (statute placing venue for lawsuits against State highway department in any county allowed for exception to transfer to a forum more convenient for witnesses); *Ramirez v. State* (Tex. Civ. App. 1977), 550 S.W.2d 121, 123 (Texas equivalent to section 30—15.12's special venue provision allowed for venue in county of defaulter's residence, county of institution defaulter was last enrolled in, or Travis County).) At trial, defendants relied heavily on the *Ramirez* case's holding that creating such a special venue statute was not unconstitutional. (*Ramirez*, 550 S.W.2d at 125.) Besides the distinction we have already

noted, the *Ramirez* court stated that the defaulters in that case could have obtained a transfer under a second special venue statute dealing with consumer transactions. (*Ramirez*, 550 S.W.2d at 122-23, 125.) Stating that this alternative statute was designed to protect litigants such as the *Ramirez* defaulter from the type of distant forum abuse of which the defaulter was complaining, the court held that the issue of the propriety of the first special venue statute was effectively waived by not making use of the protections contained in the second statute. *Ramirez*, 550 S.W.2d at 125.

We know of only one instance where a State supreme court upheld a restrictive venue statute, even where that statute provided for no alternative forum. (*Willman v. McMillen* (Mo. 1989), 779 S.W.2d 583, 585-86.) Under Missouri law, there is no doctrine of *forum non conveniens* in cases where both parties are State residents. While this does not offer Missouri litigants any relief from the oppression of an inconvenient forum before judgment is entered, the Missouri Supreme Court noted that a defendant aggrieved by an abusive forum selection has a separate right of action for abuse of process. (*Willman*, 779 S.W.2d at 586.) Therefore, even though *Willman* would uphold the statute in the case at bar, it offers post-judgment relief not available under Illinois law. See generally *Withall v. Capitol Federal Savings of America* (1987), 155 Ill. App. 3d 537, 544-45 (explaining abuse of process under Illinois law).

The statutes defendants cite are also distinguishable from the present case. Most special venue provisions contain some alternative to the restrictive forum. (See Me. Rev. Stat. Ann. tit. 14, §507 (1980) (statute allowing State to file all collection actions in any county also allows removal to another county for "sufficient reasons"); Miss. Code Ann. §37—101—279 (Supp. 1989)

(statute allows GSL collection suits to be filed in county where borrower resides, where lender is located, or in Hinds County); Ohio Rev. Code Ann. §109.16 (Anderson 1990) (statute empowering Attorney General to prosecute all actions in Franklin County provides for alternative county of defendant's residence, while prohibiting civil actions in counties where defendants do not reside).) Only Michigan has a statute which appears to allow its Attorney General to file all its actions in a single county, with no alternative venue. (Mich. Comp. Laws §14.102 (1979).) The constitutionality of this provision of the statute has never been authoritatively adjudicated, however. Also, the language of the Michigan statute appears discretionary (Mich. Comp. Laws §14.102 (1979) (any action by the Attorney General "may be begun" in Ingham County and "may be prosecuted to final judgment")), which would allow for a possible transfer to a more convenient forum under Michigan law. See *Dunn v. Carruth* (1989), 162 Ariz. 478, 480, 784 P.2d 684, 686 (similar statute interpreted to allow for transfer to more convenient forum).

Finding no authority to the contrary in the precedent of our sister States, we affirm the trial court's finding that both the special venue provision of section 30—15.12 and ISSC's practice of filing all its collection suits in Cook County violate due process under *Mathews*.

### III. The General Venue Statute

Defendants alternatively argue that, even if section 30—15.12's special venue provision is unconstitutional, the practice of filing all of ISSC's collection suits in Cook County is constitutional because, under the general venue statute, a part of the loan transaction occurred in Cook County. (See Ill. Rev. Stat. 1987, ch.

110, par. 2—101.) Particularly, defendants claim that the preparatory work done on the loan documents and especially ISSC's official approval of the loan applications occurred in ISSC's Cook County office. Without this work, which defendants assert was critical to each loan agreement, these loans allegedly would never have been made.

We find the interpretation of this statutory language to be faulty. First, there is no proof in the record that any of these "transaction[s] or some part[s] thereof" actually occurred in Cook County. The deposition testimony of both Mr. Hershman and Ms. Pietryla reveals that no one at ISSC can unequivocally state in which of the three ISSC offices these loan agreements are processed or approved. If anything, the evidence appears to indicate that the Lake County office is where most of this type of work is done, while the Cook County office is reserved for ISSC's legal department. Therefore, there is no way to identify in what county these preliminary "parts" of the loan transactions occurred.

Second, defendants are incorrect in defining the preparatory work done by ISSC staff members on the GSL agreements and the loan approvals as "part" of the transactions for venue purposes. This court has defined the place where a "transaction or some part thereof" occurs, for venue purposes, as the place where "any significant negotiations were carried on between the parties, where an agreement was signed, the place where it was, or was supposed to be performed, or where matters occurred that plaintiff has the burden of proving." (*People ex rel. Carpentier v. Lange* (1956), 8 Ill. 2d 437, 441.) The *Lange* court further explained that a finding of lack of venue is often predicated on the premise that only preliminary and insignificant details of the transaction occurred in the

county in question—details which have no substantial bearing on the ensuing cause of action. (*Lange*, 8 Ill. 2d at 441-42.) Other courts have further defined the place where the transaction occurs as the place where dealings between the parties themselves occurred while they were in an adversarial position (*Winn v. Vogel* (1952), 345 Ill. App. 425, 431-32; *La Ham v. Sterling Canning Co.* (1943), 321 Ill. App. 32, 44), or where an event or act which alters the legal relation of the parties took place (*Christopher v. West* (1952), 345 Ill. App. 515, 528).

Under this precedent, even if defendants could unequivocally prove that the loan agreements were processed and approved in Cook County, we cannot consider ISSC's preparatory work on the GSL agreements or the approval of the loans as a part of the transaction under which the causes of action in the case at bar arose. There is no proof in the record that, prior to the approval of these loans, there were any personal or direct dealings between ISSC and plaintiffs, other than the completion of the loan applications (which was done in the county where each class member resided at that time). (See *Schmelzle v. Transportation Investment Corp.* (1950), 341 Ill. App. 639, 642 (no evidence of direct dealings between parties; court looked to place where integral part of cause of action arose).) Both the loan applications and the approved loan agreements were signed and performed either in the counties of plaintiffs' residences or where the lending institutions were located. It was the signatures on the approved GSL agreements which actually altered the positions of the parties—plaintiffs would have no obligations to pay back the loans, and ISSC would not be obligated to guarantee the loans if each class member had not signed the agreements. Thus, not even the mere act of approving the loan alters the positions of

the parties involved, or obligates either party in any way. (See *American Oil Co. v. Mason* (1971), 133 Ill. App. 2d 259, 260-61 (in suit to recover unpaid balance on loan, the fact that loan agreement was forwarded to agent in Chicago, loan was approved in Chicago, and all billings, payments, and deliveries were routed to Chicago did not mean venue was proper in Cook County when loan agreement was signed, and borrowers and sureties resided, outside of Cook County).) For plaintiffs in the case at bar, none of the integral parts of these transaction occurred in Cook County. Therefore, ISSC's practice of filing all its collection actions in Cook County is improper under the general venue statute.

## IV. The Venue Waiver or Forum Selection Clause

The trial court held that the venue waiver clause defendants used in the GSL agreements was contrary to public policy. This decision was based on the appellate court's holding in *Martin-Trigona v. Roderick* (1975), 29 Ill. App. 3d 553. The *Martin-Trigona* court held that contractual venue waivers ran against the legislature's intent, as embodied in the general venue statute, to protect all defendants from being sued in a county arbitrarily selected by a plaintiff. It further stated that allowing venue waivers in contracts would result "in utter chaos in court dockets," such as ridiculous instances of long-distance forum abuse and the unfair burdening of courts outside of metropolitan areas with "Chicago-area"-size case loads. *Martin-Trigona*, 29 Ill. App. 3d at 555.

Defendants argue that *Martin-Trigona* is distinguishable from the case at bar. *Martin-Trigona* dealt with a contractual provision that was a true venue waiver—the language of the contract in that case stated that the defendant consented to venue in any

county in the State. (*Martin-Trigona*, 29 Ill. App. 3d at 554.) Defendants claim that *Calanca v. D & S Manufacturing Co.* (1987), 157 Ill. App. 3d 85, is a case in point. *Calanca* dealt with a contract between an Illinois resident and a Wisconsin corporation that contained a provision which stated that, in the event of any litigation between the parties, the forum will be in the county of the corporation's location. The *Calanca* court declared that this type of forum selection clause is *prima facie* valid and enforceable unless the opposing party shows that enforcement would be unreasonable under the circumstances. (*Calanca*, 157 Ill. App. 3d at 86-87.) To support their argument that enforcing the forum selection clause is reasonable, defendants point out that each of the class members acknowledged reading and understanding the clauses, and that none of the class members objected to the forum indicated in the agreement before they signed the contract. Further, named plaintiff Iola Lockett's GSL agreement contained no forum selection clause. Defendants claim that this establishes that class members can obtain loans without the objectionable provision.

We agree with defendants that the clause in question in the GSL agreements is a forum selection clause, similar to the clause in *Calanca*, and not technically a venue waiver clause, which *Martin-Trigona* condemned. However, we find this distinction to be immaterial to the case at bar. The underlying purpose for the holding of the *Martin-Trigona* court does not turn on the semantic focus of the contract's clause, but on the effect that clause has on the parties in light of the public policy behind the general venue statute. Using the same analytical approach as the *Martin-Trigona* court used, we reach the same conclusion. The forum selection clause in the case at bar results in the contravention of the policy underlying the general venue stat-

ute, ridiculous long-distance forum abuse, and the unfair burdening of a forum not connected to the litigation. .

But even if we were to disregard *Martin-Trigona* for the niggling reasons defendants present to us, we would still refuse to enforce the GSL forum selection clause. In the case defendants would have us rely on, the court stated that a party wishing to avoid the enforcement of a contractual forum selection must show that trial in the contractual forum will be so grievously difficult and seriously inconvenient that the party will for all practical purposes be deprived of his day in court. Otherwise, the party will be held to the bargain. (*Calanca*, 157 Ill. App. 3d at 87-88, citing *The Bremen v. Zapata Off-Shore Co.* (1972), 407 U.S. 1, 18, 32 L. Ed. 2d 513, 525, 92 S. Ct. 1907, 1917-18.) As we have already discussed at length, the policy of fixing venue in Cook County in GSL collection suits effectively deprives class members of their day in court. Thus, defendants' own arguments support affirming the trial court's decision.

Further, the fact that plaintiffs acknowledged that the forum selection clauses were in their GSL agreements and did not object to them also has no bearing on those clauses' enforceability. These contracts were standard form agreements, prepared entirely by ISSC. The GSL agreements amounted to adhesion contracts, in that the class members were in a disparate bargaining position, and, if they wanted the loan, were forced to "take it or leave it." (See *Star Finance Corp. v. McGee* (1975), 27 Ill. App. 3d 421, 426.) A contractual clause that is part of a "boilerplate" agreement, such as these GSL contracts, has its significance greatly reduced because of the inequality in the parties' bargaining power. (See *G.H. Miller & Co. v. Hanes* (N.D. Ill. 1983), 566 F. Supp. 305.) The fact that Ms. Lockett

had no forum selection clause in her GSL agreement does not demonstrate her ability to bargain for a loan without the clause, but rather indicates that ISSC did not begin to insert forum selection clauses into its GSL agreements until after December of 1981, when Ms. Lockett signed her GSL agreement.

The adhesional nature of these GSL agreements also supports our conclusion that *Calanca*'s reasoning requires voiding the forum selection clauses they contain. The *Calanca* court stated that the forum selection clause in that case was valid as the result of "an arm's-length negotiation between experienced and sophisticated businessmen," and "not part of a 'boilerplate' agreement indicating unequal bargaining power." (*Calanca*, 157 Ill. App. 3d at 88, 89.) This implies that the *Calanca* court would have given far less weight to a forum selection clause embedded in an adhesion contract.

Therefore, whether we adopt reasoning similar to *Martin-Trigona* or *Calanca*, the result is the same. We affirm the trial court's holding that defendant's use of venue waiver or forum selection clauses is contrary to public policy.

## V. Attorney Fees

The trial court's order granting attorney fees to plaintiffs indicates that the case at bar was an action brought pursuant to 42 U.S.C. §1983 (1982). Therefore, because plaintiffs prevailed in that action and this court now affirms that judgment, we hold that the trial court's award of attorney fees was proper. (See *Thaxton v. Walton* (1985), 106 Ill. 2d 513, 519-20.) However, in light of this court's recent holding in *In re Special Education of Walker* (1989), 131 Ill. 2d 300, 303-07, that the State cannot be held accountable for interest in situations where a judgment is entered against gov-

ernment entities that do not qualify as a unit of local government under section 2—1303 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—1303), we determine that the trial court's award of interest on the attorney fees was improper. We therefore affirm the trial court's award of attorney fees, but vacate the award of interest.

For the reasons given, the judgment of the trial court is affirmed in part, and the order awarding interest on the plaintiffs' costs is vacated.

*Judgment affirmed*
*in part and*
*vacated in part.*

JUSTICE MILLER, dissenting:

The majority holds unconstitutional, on due process grounds, the venue statute applicable to actions brought by the Illinois State Scholarship Commission on delinquent and defaulted student loans. The majority further determines that such actions must be brought in either the borrower's county of residence or the county where the loan was obtained. I do not agree with the majority's reasoning or its result, and therefore I respectfully dissent.

In the present case, the plaintiff class members, who are recipients of loans issued under this State's student loan program, challenged the practice of the Illinois State Scholarship Commission of bringing actions on delinquent and defaulted loans in Cook County. (The State Scholarship Commission is now known as the Illinois Student Assistance Commission. (Ill. Rev. Stat. 1989, ch. 122, par. 30—15.3.)) Many of the loan agreements signed by the borrowers contained forum-selection clauses specifically making Cook County the exclusive venue for actions on the contracts. In addition, the Commission is required by law to maintain an office in

Chicago (Ill. Rev. Stat. 1987, ch. 122, par. 30—15.3(e)), and the processing of loan applications in Cook County might be considered part of the underlying transaction and hence a basis for placing venue there under the general venue provision of section 2—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—101 (venue proper in defendant's county of residence or county where underlying "transaction or some part thereof occurred")).

While the present matter was pending in the circuit court, the legislature amended a portion of the statutory scheme that governs the student loan program, the Higher Education Student Assistance Law (Ill. Rev. Stat. 1987, ch. 122, pars. 30—15.1 through 30—15.13; Ill. Rev. Stat. 1989, ch. 122, pars. 30—15.1 through 30—24), to expressly provide that venue over such actions would lie in Cook County. Effective January 1, 1988, the following provision was added to section 30—15.12 of the Student Assistance Law: "The Commission shall file any and all lawsuits on delinquent and defaulted student loans in the County of Cook where venue shall be deemed to be proper." (Ill. Rev. Stat. 1987, ch. 122, par. 30—15.12.) Until that time, the Student Assistance Law had been silent on the venue question. Following enactment of the special venue clause, the plaintiffs amended their complaint to include a challenge to the new provision.

The parties filed cross-motions for summary judgment, and the trial judge granted the plaintiffs' motion and denied the defendants'. The trial judge invalidated the venue provision found in section 30—15.12 and ordered the Commission to bring future actions in either the borrower's county of residence or the county where the loan was obtained. The judge also ruled that the forum-selection clauses in the student loan agreements

were violative of public policy and therefore unenforceable.

The majority affirms the circuit court's judgment in all material respects. It should be noted that while the circuit court based its rationale on the asserted indigency of the plaintiff class members, the court did not limit its relief to that group, but rather invalidated the statute on its face. In the present appeal the majority likewise relies on the indigency of the class as the basis for its holding but fails to tailor its decision accordingly. The majority holds that the venue provision found in section 30—15.12 of the Student Assistance Law denies indigent borrowers access to the courts and therefore violates the due process guarantees of the Federal and State Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2). Invoking the general venue provision of section 2—101 of the Code of Civil Procedure, the majority determines that actions on delinquent and defaulted student loans must be brought in either the borrower's county of residence or the county where the loan was obtained. In so holding, the majority rejects the Commission's argument that the processing of loan applications in Cook County constitutes part of the underlying transaction and thus may serve to establish venue there under section 2—101. The majority also concludes that the venue-selection clauses found in many, if not all, of the student loan agreements are void as contracts of adhesion.

The determination by statute of where venue may lie has invariably been treated as "a matter resting within the province of the legislature." (*Chappelle v. Sorenson* (1957), 11 Ill. 2d 472, 476.) Although this court has intimated that a venue statute might be so unreasonable or burdensome as to work a denial of due process (see *Mapes v. Hulcher* (1936), 363 Ill. 227, 231), there does not appear to have been a case, until

now, in which such a statute has been held invalid, at least for any of the grounds asserted here (see Stein, *Styles of Argument and Interstate Federalism in the Law of Personal Jurisdiction*, 65 Tex. L. Rev. 689, 705 n.76 (1987)). As I shall demonstrate below, the majority's abrupt departure from settled practice cannot be supported.

I

In invalidating section 30—15.12 as violative of due process, the majority rests its determination on an analysis of the following circumstances:

> "[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews v. Eldridge* (1976), 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903.)

The majority concludes that the private interest implicated in the present case is the right of access to the courts; that the special venue provision applicable to actions on student loans operates to deny that right, and that alternative measures would adequately protect the class members' interests; and, finally, that the State's interest in having such actions brought in a single forum is comparatively slight. Weighing those circumstances in the balance, the majority concludes that the venue clause found in section 30—15.12 of the Student Assistance Law must yield to the contrary interests of the student borrowers. In my view, none of the majority's conclusions may be sustained, and I would uphold the statute.

## A

With regard to the first circumstance of the *Mathews* test, the majority finds that the private interest affected by the challenged statute is a due process right of access to the courts. In reaching that conclusion, the majority erroneously equates the private interest of the individual class members in having collection actions brought in convenient forums with a right of judicial access. I cannot concur in the majority's unwarranted extension of that right.

The majority believes that the private interest implicated in the present action is the right of access to the courts, as expressed in *Boddie v. Connecticut* (1971), 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780, and its progeny. (See *Ortwein v. Schwab* (1973), 410 U.S. 656, 35 L. Ed. 2d 572, 93 S. Ct. 1172 (*per curiam*); *United States v. Kras* (1973), 409 U.S. 434, 34 L. Ed. 2d 626, 93 S. Ct. 631.) In *Boddie*, the plaintiff class, consisting of indigent persons who wished to file. for divorce, challenged a Connecticut statute requiring the payment of certain fees as a prerequisite to bringing such an action. The Court held that the fee requirement denied the plaintiffs due process by unduly restricting their access to the courts. (*Boddie*, 401 U.S. at 382, 28 L. Ed. 2d at 122, 91 S. Ct. at 788.) In reaching that conclusion, the Court emphasized the fundamental nature of the marital relationship and the absence of nonjudicial alternatives to divorce proceedings. Thus, without payment of the necessary court fee, the plaintiff class members could not avail themselves of "the exclusive precondition to the adjustment of a fundamental human relationship." *Boddie*, 401 U.S. at 383, 28 L. Ed. 2d at 122, 91 S. Ct. at 788.

Subsequent Supreme Court decisions evaluating a civil litigant's right of access to the courts have hewed

to *Boddie*'s focus on the fundamental nature of the underlying interest and the absence of alternative means of vindicating that interest. (See *Ortwein*, 410 U.S. at 658-60, 35 L. Ed. 2d at 575-76, 93 S. Ct. at 1173-75; *Kras*, 409 U.S. at 443-46, 34 L. Ed. 2d at 635-36, 93 S. Ct. at 637-38.) In *Kras*, the Court ruled that imposition of a filing fee on persons seeking discharge in bankruptcy did not deprive such persons of access to the courts. The Court first determined that a bankrupt's interest in the elimination of his burden of debts "does not rise to the same constitutional level" as the marital interest implicated in *Boddie*. (*Kras*, 409 U.S. at 444-45, 34 L. Ed. 2d at 635, 93 S. Ct. at 638.) The Court next declared that judicial process was not the exclusive remedy for a debtor seeking adjustment of his debts. (*Kras*, 409 U.S. at 445-46, 34 L. Ed. 2d at 636, 93 S. Ct. at 638.) The Court therefore concluded that the fee requirement did not violate the right of judicial access expressed in *Boddie*.

In *Ortwein*, the Court again found *Boddie* distinguishable and rejected a challenge to the imposition of court filing fees on indigent persons seeking judicial review of State agency decisions reducing their welfare benefits. The Court found that the interest of the recipients in increased welfare benefits had "far less constitutional significance" than the interest implicated in *Boddie*. (*Ortwein*, 410 U.S. at 659, 35 L. Ed. 2d at 575, 93 S. Ct. at 1174.) In addition, the Court noted that the recipients had been afforded an alternative remedy in the form of pretermination hearings that did not require the payment of a fee. (*Ortwein*, 410 U.S. at 659-60, 35 L. Ed. 2d at 576, 93 S. Ct. at 1174.) The Court concluded that the filing fee requirement did not deny the recipients access to the courts.

The majority acknowledges that the right of access articulated in *Boddie*, *Kras*, and *Ortwein* is relatively

narrow, but the majority suggests nonetheless that other Federal courts have recognized an expanded right. (139 Ill. 2d at 44-45.) The majority is able to marshall only scant support for such a proposition, however, and the authorities offered by the majority in support of its rationale are readily distinguishable. The cases simply have found, under circumstances demonstrably different from those involved here, overreaching or burdensome conduct by one litigant resulting in the denial of another party's access to the courts. (See *Harrison v. Springdale Water & Sewer Comm'n* (8th Cir. 1986), 780 F.2d 1422 (admittedly frivolous condemnation counterclaim filed by local authorities in response to landowners' action for damages to property implicates landowners' right of judicial access); *Ryland v. Shapiro* (5th Cir. 1983), 708 F.2d 967 (actions by local authorities in concealing prosecutor's murder of plaintiffs' daughter interfered with plaintiffs' right to bring wrongful death claim against murderer and thus denied plaintiffs judicial access); *McCoy v. Goldin* (S.D.N.Y. 1984), 598 F. Supp. 310 (provision in city's wage agreement with certain municipal employees requiring signatories to waive statutory right to litigate wage determination violated employees' right of judicial access).) At most, those decisions suggest that conduct by a party may in certain cases be so oppressive or outrageous that it effectively deprives an opposing party of judicial access. The two State court cases cited by the majority (139 Ill. 2d at 44-45) are similarly unpersuasive in the present context. See *Patrick v. Lynden Transport, Inc.* (Alaska 1988), 765 P.2d 1375 (State statute requiring nonresident plaintiffs to post bond to cover costs and attorney fees for which they might later be liable violative of equal protection guarantee of State constitution); *Bush v. Reid* (Alaska 1973), 516 P.2d 1215 (State statute barring prison pa-

rolees from bringing civil actions violative of Federal and State constitutional rights of access to courts).

In essence, the majority confuses the convenience of a particular forum to a particular party with the right of judicial access. Here, the private interest of the plaintiff class members may be described as "an interest in personally appearing in a local court." (*Phillips v. Pennsylvania Higher Education Assistance Agency* (3d Cir. 1981), 657 F.2d 554, 564.) *Phillips* considered a similar court-access argument by indigent recipients of student loans who resided more than 200 miles from the Pennsylvania county in which actions on their loans were filed. In holding that the plaintiff class members' right of access to the courts was not implicated by the location of the actions, the *Phillips* court noted, "We find no cases recognizing any general right to appear personally in local courts and reject any contention that such an interest is substantial." *Phillips*, 657 F.2d at 564.

In addition, it cannot be said that the plaintiff class members, once they were unable to repay their student loans, had no alternative to being sued. Contrary to the majority's assertion (139 Ill. 2d at 45), court proceedings are the last step in a series of steps taken by the Commission against delinquent borrowers. Before the Commission may file suit, it is required by Federal guidelines to make several contacts with a borrower concerning the status of the loan and must advise the borrower of the consequences of nonpayment. (See 34 C.F.R. §682.410 (1989).) Federal law also establishes circumstances in which a borrower may be eligible for deferment or forbearance of repayment. (See 20 U.S.C. §1078 (1988); 34 C.F.R. §§682.210, 682.211 (1989).) In the proceedings below, Kenneth Vick, the Commission's acting manager of litigation services, stated in an affidavit that the Commission issues a number of

demand-for-payment requests to a delinquent borrower and files suit only if the borrower fails to respond to the requests or refuses to cooperate in setting up an affordable repayment plan. It may also be noted that the record in the present case discloses numerous examples of voluntary repayment plans negotiated by borrowers and the Commission after actions on the loans were filed. Thus, there is no support for the majority's assertion that court proceedings are the sole remedy afforded to borrowers who experience difficulty in repaying their student loan obligations.

Unlike the majority, then, I do not interpret the right of access to the courts, applied in the context of the present proceedings, as carrying with it the requirement that an indigent person be sued in a convenient forum. Precedent clearly demonstrates that the right of access expressed by the Court in *Boddie* is implicated only when the affected interest is fundamental and no other mechanism exists that may afford adequate relief. (See *Ortwein*, 410 U.S. at 658-60, 35 L. Ed. 2d at 575-76, 93 S. Ct. at 1173-75; *Kras*, 409 U.S. at 443-46, 34 L. Ed. 2d at 635-36, 93 S. Ct. at 637-38.) It is clear that the case before us does not present such a situation. The challenged statute reflects the legislature's assessment of where venue lies in an action of this type. As I have stated, such a determination normally rests within the province of the legislature. By deriving from *Boddie* and its progeny an overarching right of judicial access—one that is both independent of the interest asserted and heedless of other available remedies—the majority has, I submit, raised severe and unnecessary obstacles to future procedural rulemaking, by either this court or the legislature.

B

The second part of the *Mathews* test requires consideration of "the risk of an erroneous deprivation of the [affected] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" (*Mathews*, 424 U.S. at 335, 47 L. Ed. 2d at 33, 96 S. Ct. at 903). The majority concludes that the challenged venue provision poses a substantial risk of erroneous deprivation and that alternative safeguards, such as the recognition of additional venues for the Commission's actions, would afford the plaintiff class members sufficient protection.

The majority believes that operation of the venue provision contained in section 30—15.12 of the Student Assistance Law will threaten to deny the indigent class members the opportunity to present their defenses to actions brought against them by the Commission. But unlike *Peralta v. Heights Medical Center, Inc.* (1988), 485 U.S. 80, 99 L. Ed. 2d 75, 108 S. Ct. 896, on which the majority relies, it is undisputed in the present case that the plaintiff class members do receive notice of the proceedings against them and are afforded an opportunity to defend their interests. There is no contention here that the plaintiffs are denied those most basic requirements of due process (see *Armstrong v. Manzo* (1965), 380 U.S. 545, 550, 14 L. Ed. 2d 62, 65, 85 S. Ct. 1187, 1190; *Mullane v. Central Hanover Bank & Trust Co.* (1950), 339 U.S. 306, 314, 94 L. Ed. 865, 873, 70 S. Ct. 652, 657), as was the defaulted party in *Peralta*.

As I have already stated, litigation is the last step taken by the Commission in its collection efforts against borrowers who encounter difficulty in repaying their student loans. Before commencing an action against a borrower, the Commission, as required by

law, attempts to work out an alternative repayment plan with the borrower. Moreover, a borrower may in certain cases obtain deferment or forbearance of repayment. Thus, means already exist, short of litigation, by which borrowers may resolve their disputes with the Commission. If present procedures pose a risk that a borrower's defenses may go unheard, it arises from the class members' asserted inability to procure counsel in a distant forum and travel there to defend their interests. But such a risk is inherent even in the remedy ordered by the circuit court and adopted by the majority in the present appeal. Because the Commission may, under today's decision, bring an action in the county where the loan was obtained, an indigent borrower who is not a resident of the particular forum might still find himself forced to defend an action in an inconvenient place.

The majority construes the venue provision of section 30—15.12 of the Higher Education Student Assistance Law as placing venue over student loan collection cases exclusively in Cook County. Under that interpretation, transfer on *forum non conveniens* ground would not be available to a borrower, and the majority thus finds the statute to be in irreconcilable conflict with our general venue provisions, under which such intrastate transfers are permitted as a matter of common law. (See *Torres v. Walsh* (1983), 98 Ill. 2d 338, 347-51.) In addition, the majority fears that our recognition of the validity of section 30—15.12 would only encourage other State agencies to secure the enactment of special venue provisions for actions involving them, a practice that the majority condemns. In making these observations, the majority appears to be offering a separate reason for not giving effect to the venue provision found in section 30—15.12: that the statute cannot be reconciled with the general venue rules of section

2—101 and is inconsistent with long-standing practice in this State. 139 Ill. 2d at 53, 57-58.

The language of section 30—15.12 does not clearly compel the majority's conclusion that the provision places venue exclusively in Cook County. In my view, the provision may be interpreted instead as requiring the initiation of such actions in Cook County but not precluding their later transfer to another forum. When statutory language is reasonably susceptible of different interpretations, one favoring its constitutionality is normally preferred. (*People v. Orth* (1988), 124 Ill. 2d 326, 334; *Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 60.) But even if it is assumed that the statute establishes venue exclusively in Cook County, and thus forbids transfer to another county on *forum non conveniens* grounds, such a construction does not place the special venue provision in irreconcilable conflict with section 2—101 or counter the established practice in this jurisdiction.

The majority's rejection of section 30—15.12 because of a supposed conflict with our other venue statutes is untenable. Even if the provisions were deemed to be inconsistent with one another, we would not be warranted in disregarding section 30—15.12. Rather, applying the familiar rules of statutory construction, we would readily conclude that the venue clause found in section 30—15.12, as the more recent enactment and the more specific provision, must prevail. See *Secretary of State v. Mikusch* (1990), 138 Ill. 2d 242, 254.

There is no need in the present case, however, to apply those canons of construction, for the different statutes may be reconciled without recourse to interpretive tools. Section 2—103(c) of the Code of Civil Procedure provides, "Any action which is made local by any statute must be brought in the county designated in the statute." (Ill. Rev. Stat. 1987, ch. 110,

par. 2—103(c).) That provision, which the majority fails to discuss, is intended to preserve the primacy of specialized venue statutes over the more general measures. (See Ill. Ann. Stat., ch. 110, par. 2—103, Historical & Practice Notes, at 81 (Smith-Hurd 1983).) Applied to the present case, section 2—103(c) would allow us to give effect to the separate venue provision found in section 30—15.12 of the Higher Education Student Assistance Law. Thus, contrary to the majority's view, the venue statutes are reconcilable and form a consistent whole; we should not presume that the legislature intended the challenged provision to be a nullity.

C

The third circumstance under the *Mathews* test requires consideration of the State's interest in the challenged practice and the effect on that interest of the use of alternative procedures. Analyzing this aspect, the majority finds that the State's interest in the present system is comparatively weak. That conclusion, however, ignores the record evidence of the Commission's growing caseload and slights the State's interest in having these matters handled in a central office in a single forum.

The State has a legitimate interest in pursuing the repayment of student loans in an expeditious manner, for compliance must be had with certain Federal regulations to ensure continued reimbursement for the State's losses under the student loan program (see 34 C.F.R. §§682.406, 682.414(c) (1989)). The location of the Commission's actions in one county serves an important part in achieving those goals. There, the necessary paperwork may be processed by a trained central staff. Consideration is also owed to the crush of litigation faced by the Commission. According to the infor-

mation in the record, the Commission had some 5,000 active cases at the time the present matter was pending in the circuit court. Moreover, the Commission expected its caseload to quadruple within three years. In requiring that actions on delinquent and defaulted student loans be brought throughout the State, today's decision will substantially increase the heavy administrative burden already borne by the Commission. I would conclude that the State has a strong interest in centralizing collection actions in a single county and that the alternative procedures decreed by the majority will thwart that interest.

## II

In my view, the majority misconstrues the right being asserted by the plaintiff class members, ignores the place of section 30—15.12 in the realm of Illinois venue statutes, and underestimates the State's interest in centralized control over actions on delinquent and defaulted student loans. In sum, I do not believe that the venue provision contained in section 30—15.12 of the Higher Education Student Assistance Law unconstitutionally denies the plaintiff class members access to the courts.

Indeed, the majority's analysis ultimately proves too much. Consistent application of the majority's logic would compel the invalidation of other special venue provisions and even the general venue statute on which the majority purports to rely. The majority's analysis suggests a right of an indigent in a civil matter to have a claim resolved in a local court. Recognition of such a right would, of course, eliminate any basis for venue apart from the defendant's county of residence. Thus, under the majority's analysis, an action against an indigent defendant must be brought in the defendant's home county; by the same token, an indigent

plaintiff must be entitled to bring an action in his home county. The majority offers no explanation of where venue would properly lie for an action brought against indigent defendants of different counties, or for an action brought by an indigent plaintiff of one county against an indigent defendant of another.

I would also reject the plaintiff class members' alternative challenge to the provision on equal protection grounds. The statute does not affect a fundamental interest of the plaintiff class, and it bears a rational relationship to the State's legitimate goal of centralizing actions on student loans in one location. (See *United States v. Kras* (1973), 409 U.S. 434, 446-49, 34 L. Ed. 2d 626, 636-38, 93 S. Ct. 631, 638-40.) Finally, if it is assumed that the venue provision contained in section 30—15.12 would not be applicable to proceedings pending at the time it took effect (but see *Sanelli v. Glenview State Bank* (1985), 108 Ill. 2d 1), a point I do not decide, I would undertake only a case-by-case consideration of the plaintiff class members' separate challenges to the Commission's practice, before the effective date of that statute, of filing such actions in Cook County. The Commission's earlier practice apparently rested on two grounds, either one of which could be sufficient to sustain a finding of venue: the inclusion of venue-selection clauses in many of the student loan agreements, making venue a matter of contract between the parties (see *The Bremen v. Zapata Off-Shore Co.* (1972), 407 U.S. 1, 32 L. Ed. 2d 513, 92 S. Ct. 1907; *Calanca v. D & S Manufacturing Co.* (1987), 157 Ill. App. 3d 85), and the processing of student loan applications in Cook County, satisfying the requirements of the general venue statute (see Ill. Rev. Stat. 1987, ch. 110, par. 2—101 (venue proper in county of defendant's residence or county where part of underlying transaction occurred)). From the record before us, it

appears that the circumstances of the individual class members with regard to these alternative grounds for venue may be fact-specific to their own situations.

For the reasons stated, I respectfully dissent.

CHIEF JUSTICE MORAN and JUSTICE RYAN join in this dissent.